May it please the Court, John Dragseth for Appellant 3M. I have Deanna Reichel with me today. This is a declaratory judgment case that we submit was decided by the District Court under the wrong legal standard, and that we believe is being argued by Avery under the wrong legal standard, and that under the right legal standard should be reversed. And to establish that there is an imminent likelihood that a lawsuit would be filed. What is relevant after MedImmune is that there is a current legal dispute, or an imminent legal dispute. We think there's a current one here, so imminence isn't relevant. It took a year for you to sue after the last communication. How does that justify TJA jurisdiction? It did take a year. There's two answers to that. The first answer is it's not relevant. Nothing occurred during that year to take away the dispute that had happened. Avery says that the matter was dropped. That was news to us. There was no communication to drop the matter. 3M didn't think the matter was dropped. Avery never communicated that the matter was dropped. Isn't silence a fact of importance, a passage of time? It is very attenuated, and I can almost say no to that, although there's probably situations where it might be relevant. I think the Myriad case is the most instructive here, and that's basically, I think to paraphrase it, it says that the passage of time doesn't cause a decay in any dispute. What causes a dispute to go away is, for example, if 3M started making a different product, which it did not, or if Avery came back and said, well, we changed our mind, or we didn't mean to say that in the April and May conversation, something like that. But the mere passage of time does not have that effect. It only has that effect if you think... If we agree with you, the case has to go back, and the court still has a decision to make concerning the discretionary question of whether to exercise jurisdiction. He may. He may. And we can almost guess at the result, given what he did here. What we would like is what the court did in Sandisk, and in some of the other cases, is they decided on the record that's been made, and we don't think there's any basis on the record that's been made for the discretionary denial. We have everything that MedImmune says is needed. We have everything that Sandisk says is needed. There are no additional factors here that weren't there in Sandisk, and we would recommend the same result for that. Isn't it also... I interpret this as just a couple of casual phone calls, a year of silence, and any litigation history is different products, different patents. They never sent the claim charts. There's just a lot to suggest that this, whatever cloud had occurred, had blown over. You can characterize it as casual, and they do. I think what you want to do is look at the facts and not try to characterize what it is. The facts are that they started the communication. This was not a situation where we forced the issue, called them up out of the blue and said, we don't think we infringed. Tell us what you think. It's not that sort of situation. There were two calls. It wasn't accidental. If it had been casual or something that hadn't been meant to be said, on the second phone call, Mr. Sardisy would have said, you know what, I misspoke in that prior call. They make a lot about the fact that in their view, that first call was dealing with another matter, started with another matter, and that this just kind of rolled out of his mouth is the suggestion. Usually we have a written record of some kind, too. This is all airwaves. This is all talking one to another. Sure, and I don't think the court has said that function trumps form in that place. The question is what was communicated, not how was it communicated. Only if they were trying to argue that... But the how it's communicated can be quite important. If they say, you are infringing and we're coming after you, that's a little different than saying, hey, you might want to take a look at this. There might be an issue here. But I don't think that matters whether they say that. The content matters, sure, but whether it's said in a phone call or in a letter does not matter in our view. Except that when we have a letter, we can see whether they said, you're in trouble, or hey, you might want to take a look. But here you have sworn... Here we've just got things being characterized. You have sworn declarations and you have contemporaneous notes, and it's important to look at what are the disputed facts here because there's a lot of play about disputed facts and undisputed facts. One thing I think the district court got right is to recognize there really aren't many disputed facts here. The primary one that they bring up is the may infringe language. First of all, I don't think that matters because this court's held magic words aren't needed. It's held a finding of jurisdiction on less than that. But if we look at the actual record here, the declaration of Rhodes says that definitely that he said may infringe. The notes of Rhodes say may infringe, in quotes. The declaration of Sardisy is very careful if you look at it. There's a statement that says, I don't remember saying may infringe. And then he says very unequivocally, I did not say does infringe. Is it true in this case that the court didn't really make any fact determinations, just took the facts and assumed the facts as pled by 3M and on that basis found that there was no D.J. jurisdiction? And if we conclude that the court is wrong, doesn't that mean it has to go back to the district court to actually make some fact finding? So I think no. And so one of them is the whole point about may infringe, and our point is that doesn't matter because magic words aren't required, plus if you look at the declaration, there's not a dispute. We're willing to admit that Sardisy doesn't remember saying it. That's all he says in his declaration, I don't remember. Rhodes says, and backs it up with his email, contemporaneous email, his contemporaneous note, that Sardisy did say it. So there's no dispute on that point. But wouldn't the court be required to make some fact finding on these issues? The court didn't make any fact findings. The court didn't weigh and balance and look and review and consider everything in context and make those kinds of determinations, correct? You could certainly send a fact for them to do it. I think our point is you don't need to. The record's fully formed. You agree with me that the court didn't do that. Correct. Right. Our point is that we don't need to have extra litigation here just to do that because if you actually look at the record that's fully formed, it's in the appendix. You can see there's no dispute on the May infringe point. The other one that gets brought up quite a bit is the confidentiality point. If you look at that, Sardisy says, I understood that our conversations, and this is 2203 of the appendix, paragraph 8 of his declaration. He says, I understood our conversations, including the conversations in March and April, to be covered by the confidentiality agreement that 3M identifies in paragraph 35 of its complaint. Then you go to paragraph 35 of the complaint and we talk about a gentleman's agreement. I don't think there's anything in the record what that is, but what I understand is they had a conversation while walking out of a meeting to say, let's talk more often. Our view is that that's all he said, but there's no condemnation. How constructive is this? We're fighting over whether or not you're fighting and you're bringing it all the way to the circuit court. I'm a little confused as to the sound business strategy of that. The business strategy is, there's no strategy here. The attempt here is to get these questions resolved and get this off of 3M's back. I think the court has said in previous cases, Micron and others- They say they're not on your back. They have not said they're not on our back. We want them to say they're not on our back. They said that they haven't threatened to sue us and there was no imminent threat of suit. That's all they've said so far. We can't get them off our back. They said it was dropped, but they haven't given up any of their rights, so they are on our back. We are proceeding under threat of lost profits damages now. That was something that changed right before the suit was filed at the end of the one year. It went from royalty to lost profits. As the cases have recognized, we're under threat of travel damages potentially. We don't think so, but the cases have looked at that. The purpose of the Declaratory Judgment Act and what this court has identified multiple times, Sandisk, Micron, other cases, is to allow 3M to get that off its back. Whether we wanted to come up- We certainly didn't want to come up here. We wanted to go forward with the suit and we still want to go forward with the suit. We're not trying to multiply litigation costs at all here. We want to get sent back down and go forward with this suit. This suit will- You can expect this suit will be going forward somewhere. We prefer that it occur where it was first filed and on remand, we would want it to go forward. We do think- Why will it go on anyway? If we affirm the judgment here and they don't sue, isn't that it unless there are new acts? If they don't sue, it won't go on. We don't believe they won't sue. We have a lawsuit going against them on retroreflective technology. If they don't sue, they don't have a lawsuit going against us on retroreflective technology. We don't believe they won't sue. Of course, there's nothing in the record on that. We think- Turning to their legal argument, we rely centrally on SanDisk and the statement in SanDisk that says that it's enough if a party identifies a particular patent, identify a particular product, and the other party disagrees. We have all of that here. They argue that we haven't shown an injury in fact. The injury in fact is shown by those facts right there, the treble damages, the lost profits damages, and so on. Whether the word injury in fact was used in our opening brief is irrelevant. If that's the criticism, then every decision this court has decided, other than really PRASCO, is at fault. The injury in fact determination is subsumed in what MedImmune has decided and what they say in SanDisk. The point about there actually being a threat, there being a response, there being identification of products, and there being identification of the particular patent. That is what creates the injury in fact. That notice, the test for notice, it puts the defendant on notice and it starts accruing damages. I'd like to keep your bubble time. Thank you. Go ahead. Good morning, Your Honors. I heard, first of all, that the wrong legal standard was applied. I don't think that's the case. The court at 8-5 and 8-12 specifically cited to MedImmune and restated the test that MedImmune generally described, which is facts which under all the circumstances show a substantial controversy between the parties having adversity. There's no dispute, no controversy, then why don't you just grant a covenant not to sue? Your Honor, as the court said in PRASCO, there's no reason that a patent holder must abide by the time and place that a potential infringer requests a covenant not to sue. The covenant not to sue was asked for after we said we were going to file a motion to dismiss for lack of jurisdiction. We may decide to sue at some point. We may not. I don't think a decision has been made, and we're not supposed to be held to their request for a covenant to sue, especially when it's as broad as they requested. All future possible infringement under all future possible products. Having notified them of the patents and having identified the products in question, isn't that enough to establish a case of controversy, certainly under MedImmune and SanDisk? I don't think it is, Your Honor. In the HP case, you actually said... I mean, you just said, well, you don't have to necessarily make a decision as to when you might want to file suit. But haven't you placed the wheels in motion? No, Your Honor. Simply the identification of a patent and the identification of a product, as this court said in Hewlett-Packard, does not form the basis for declaratory judgment jurisdiction. But there was more here. There's more. Well, there's a dispute as to whether there was more, as you recognize, Your Honor. Essentially, even though there was a factual attack on the pleadings, it was treated more like a facial attack. In our current procedural circumstance, we must assume the facts as they're stated by 3N. And you've got IP counsels, not just people who don't know what's going on. You've got threatened claim charts. You've got specific patents, numbers. You've got products, specific products. You've got the patents being reissued, which I would perhaps reasonably interpret as spiffing those patents up for litigation, which is about to occur. There seems to be a lot more than just a casual conversation. Well, Your Honor, I think you recognize properly that the form of the communication actually does inform whether it's a casual conversation or a real threat. This court has never found declaratory judgment jurisdiction based upon phone calls. If you really were to take the seat and think about how long those phone calls would have for all of them, I think one other point, Your Honor did recognize that the court accepted the facts as 3M stated them, except for one fact, which was whether the prior litigations were related. So that factual finding was in our favor. But I think one thing that's actually telling here, if you look at the contemporaneous notes of Mr. Rhodes, who claims to have written down what was said as they were occurring, I believe it's in the record at 2432, which is his notes when, after the suit was filed, when Avery asked him what the basis of those, of the declaratory judgment jurisdiction was, he at first said, well, it goes back to 2005 and those conversations we had in that other litigation. We know those are out. Those cannot form the basis. The basis then changed. But the point that I want to get to is the very, is the very last... Are you suggesting that as long as it's a phone call, I can threaten almost as much as I want? Absolutely not, Your Honor. And there are no magic words, and I agree. You don't have to say you infringe, but what this court has said when they said there are no magic words, you still have to convey the thought that there is some threat or there is some assertion of rights. You don't want to establish a rule which says that parties, big corporations may never speak about patents or always run the risk. Anytime you identify a patent, anytime you identify any product, you run the risk of being DJed. This court said that's not the case in HP. Merely identifying a patent and identifying a product does not establish declaratory jurisdiction. There's a history here. Multiple patents, multiple products, multiple communications. This isn't just one single short telephone call. I disagree with that, Your Honor. There was one telephone call in which Mr. Sadeci said, what he believes he said was, are you still interested in licensing this patent or these patents because of communications that had taken place in the past? And the response that comes back is actually consistent with that statement. We weren't interested then, we're not interested now. There's no assertion of rights. There's nothing like in Sandus where they demanded a royalty and said, after demanding a royalty, there was a series of escalating phone calls, a series of escalating meetings in which they hired experts, ST hired experts, and actually over many, many days did a claim by claim, element by element presentation. In that situation, there was a very concrete assertion of rights for a royalty based on a claim that you infringed these patents and here's how you infringed them. There's nothing here like that. And I would direct the court, there's an older case, a pre-metamune case, which is actually very similar to this case. It's Cigna versus Alza. And in that case, the reason it's very similar is because the patent holder informed the alleged infringer that its patents had been reissued. And the court in that case said, you know, when you've had prior communications about certain patents and you've had prior licensing discussions, it actually does make sense when you've had a reissue or re-exam in that case to inform them that in fact it has been reissued or re-exam. But Mr. Bilster, talking about this history, you had prior litigation, albeit a number of years ago, relating to similar products. You had the reissue proceedings, which have, as Judge Rader pointed out, some suggestion, some relevance. And then you have the may infringe communication and then soon thereafter, licenses are available and claim charts forthcoming. And then there's another infringement suit that a lot of interaction between these two competitive parties on these types of products. I would actually assert there's not that much litigation between them. You have to realize that these are two multi-multi-billion dollar companies with probably hundreds if not thousands of products that compete against each other. The one case that we're talking about was filed in 2000. That related to retro-reflective sheeting, but certainly did not relate to these products and these patents weren't even issued at that time. So that's not related. The suit that was filed on, in fact, it actually shows that when Avery wants to sue, it doesn't wait and does it. You know, it sued the night after its patent was issued. There was no waiting. And I believe that one of your first questions was, is the passage of time relevant? And actually, absolutely it is. In the MedImmune case, or excuse me, in the American Association for Pathology case, the Myriad case, 10 years had passed. But the reason the court said that that 10 years was not relevant to whether there was an immediate threat of suit or some immediacy was because in that interim, Myriad had continued to enforce that patent against the entire industry against many others. That's not the case here. If you go back... But doesn't the passage of time here, in a way, not diminish the conflict, but it enhances the conflict because the damages continue to accrue? Well, I think that... Once they were placed on notice of the patents, that clearly started the clock on damages, did it not? Well, there could be a latches issue at that point, Your Honor. But I think what the... Ignoring any latches argument, the fact that they were notified of the patents starts the clock on damages, correct? Well, they claim they were notified of the patents not by our informing them, but because they were monitoring the proceedings based upon the communications that were occurring in 2005. Well, that's fine. You keep bringing up extraneous things. Just answer my question. Certainly the fact that they were notified of the patents is clearly a start of the accumulation of damages, correct? It can be a start of accumulation of damages. So, you have a year's worth of accumulated damages that they are now worried about. Isn't that reasonable? I don't think that's unreasonable, Your Honor. Going back to the passage of time, though, the way that that has been applied is whether it shows a controversy of substantial immediacy. And there are at least four cases in which this court... Or three cases in which this court has addressed that. Going back to the Cygnus v. Alza case, there was a passage of five years. The court said based on that passage of five years between when there was a first communication between the parties and the DJ was filed, that indicates there is no immediacy, no substantial immediacy of a controversy. The same thing in the Micron v. Mosse case. Even though the court did find DJ jurisdiction there, it actually... of time and said, well, during that four years, there were things going on. The patent holder was asserting his patent against others, therefore the passage of time was not relevant. But what these cases show is, in general, it is something that should be looked at. Your Honor, I do not have anything further unless you have further questions for me. Thank you, Mr. Bilsker. Mr. Dragsif, you have a little less than four minutes. There was no discussion in the interim argument about the Sandisk standard. What Sandisk says is, I think, very instructive. It says, Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior, which is what 3M is being forced to do, or abandoning that which he claims a right to do, which is what the doctors in Myriad were forced to do. Another quote, we hold only that we're a patentee, and they say only because there was an assertion that, well, maybe you could have declaratory judgment jurisdiction where there hadn't been any sort of communication. So the only is to that. We hold only that we're a patentee asserts rights under a patent based on certain identified activity, making the DG3, DGQ product, or of another party, and where the party contends that it has a right to engage in the accused activity without license, Mr. Rhodes clearly did that. An Article III case or controversy will arise, and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of legal rights. So we clearly meet that standard. I believe a lot of the other facts are extraneous. We don't need those. The covenant not to sue is helpful to us. We don't need it. The other lawsuits are helpful to us. We don't need them. The fact that these were under reissue are helpful to us. We don't need them. One extra point, though, is he brought up, Mr. Sardisy, in his conversation, brought up the fact of the reissues coming out. And so it wasn't just that these reissues were happening just in the abstract and that we latched onto that. He actually brought that up in the phone call. That is unsputed. It's in the Rhodes Declaration and not dealt with in the Sardisy Declaration or in the Meyer Declaration. The statement about Hewlett-Packard and how the accusations that we read from the Sandus standard aren't enough. I think the distinction of Hewlett-Packard and the use of the immediacy standard here today shows that both the district court and Avery still are working under the wrong standard for immediacy. Okay? The district court, if you look how it distinguished our cases, it said in HP it was a non-practicing entity and that there was a deadline. Those facts are relevant if you're worried about whether the non-practicing entity was going to file a lawsuit, not whether the communications identified patents and identified rights and so on. So there isn't a whole lot that the district court said here to figure out what its basis was. But when you look, it's clear that it was focusing on immediacy of the lawsuit. Same thing with the argument today on citing the case of Cygnus. It was a case decided under immediacy of a lawsuit. The other case that they cited, the HP and the remaining cases were decided pre-metamune by the district court, immediacy of a lawsuit. So the immediacy here is of the dispute. Clearly we have it here. They've identified products. They've identified the patent that cover those products. The passage of time, we are with you on the accruing damages. A couple extra points, so it's relevant to the one-year delay, is when they introduced their product, which was immediately before the lawsuit, or right contemporaneous with the ultimate lawsuit being filed, that not only went from royalties to lost profits damages, but it also increased substantially, I would submit, their ability to try to get an injunction. Maybe it's not a great chance, but once you have it, you're not going to get an injunction in the current world if you don't have the product. Once they have the product, that goes up. So the world did change. Not only did the world not change to the negative in the interim, just like in Myriad, but the world did change to the positive right before the filing of the lawsuit. So we request the court reverse and send back so the case can proceed. Thank you, Mr. Draxler. Thank you. The last case this morning.